Good morning, counsel. I'm Judge Dennis and together with Judge Wiener and Judge Duncan, I'm Judge Dennis. You are your panel this morning. We welcome you to the Fifth Circuit and we'll call your case against the United States Department of Housing and Urban Development. We'll hear first from Mr. Hawkins. Thank you, Your Honor. Good morning. I'm sorry, Ms. Miles. Yes. Yes, Your Honor. Good morning. May it please the court. My name is Kimberly Brown Miles and I represent the appellants plaintiffs in this matter, along with my colleague Velimir Rasich and Daniel Bishara, PC. Plaintiffs are residents of Carpentry Village Apartments, a privately owned complex that receives a project-based rental assistance subsidy from HUD. Plaintiffs have contracted with the complex to receive decent, safe and sanitary units as mandated by HUD regulations and the housing assistance payment contract between HUD and the owner. The tenant's qualification for housing assistance is tied to this complex and if the tenant leaves, they will lose their subsidy. The amended complaint in this matter pleads that HUD has not provided plaintiffs with decent, safe and sanitary housing. The record reveals that HUD knows that the housing is not decent, safe and sanitary and has provided the owner with two notices of default. The owner failed to complete the corrective actions specified in the notices of default within the time period allowed in both notices. No extensions of time granted by HUD are in the appellate record. The units continue to present imminent health and safety risks to residents. The amended complaint further pleads that plaintiffs have requested relocation assistance from HUD in the form of comments. HUD has denied plaintiffs' request for assistance. Plaintiffs are requesting judicial review of HUD's denial of relocation assistance. Copper Tree is located in a predominantly minority census tract. The living conditions at Copper Tree affect 87% Black tenants. Conversely, HUD is providing decent, safe and sanitary housing to white PBRA tenants in the woodlands. HUD is providing better treatment to similarly situated white PBRA tenants by providing them with decent, safe and sanitary housing and is not providing decent, safe and sanitary housing to Black plaintiffs at Copper Tree. HUD admits in its brief that the Appropriations Act permits authorization of tenant protection vouchers without abatement of the contract or enforcement action by HUD beyond the notices of default already issued to the owner. The prerequisites of the Act have been met. The owner has received two notices of default and the complex still presents imminent health and safety risks to tenants. Instruments of tenant protection vouchers under the Consolidated Appropriations Act would allow the plaintiffs to access decent, safe and sanitary housing. HUD's final agency action is exactly the type of claim subject to judicial review under Weyerhaeuser v. U.S. Wildlife based on the agency not considering the factors set forth in the statute and guiding its decision to withhold assistance. Miles, what is the final agency action? The withholding of relocation assistance from the plaintiffs at Copper Tree. Molly, can I look to a document or a decision or ruling by the agency that says that or are we just sort of inferring that there's been final agency action? There is no specific document that says that, Your Honor. On October 18, 2018, in the appellate record, the HUD sent a notice to Copper Tree tenants requesting comments on advising them of the notices of default. That's in the record at 111 to 112. Advising them of the notice of default and the corrective actions that the owner is mandated to make. The plaintiffs submitted comments to HUD in response to their request and requested relocation assistance. HUD did not respond at all. In terms of final agency action as defined under the Act, an agency action can be defined as a denial of relief under Section 551.13. The relief in this case that the plaintiffs were requesting were the tenant protection vouchers, which would allow them to access decent, safe, and sanitary housing. I'll be honest with you. The conditions in this complex sound deplorable. When HUD is in that situation where you've got notices of default, does it have a menu of options to try to... In other words, does it have a number of tools in the toolkit where it can say, this is what we're going to do to try to improve the situation? Yes, Your Honor, and that is within HUD's discretion. HUD has a myriad of enforcement options. Like what, for example? What can it do? As far as I understand, they can put the owner on a plan to make actions. Actually, the notices of default themselves give the owner a specified time period. In the record, there are two notices of default that we cited in the amended complaint. The October 3rd notice of default, which gave them 30 days to make the corrective actions, and then the October 9th notice of default, 2018 as well, that gave them 60 days. The owner did not make the corrective actions in the notices of default. In the Appropriations Act, there are a myriad of options that the owner has. However, and that's that section, I believe, 1034 to 1035. I agree with you that there are many things that the owner might have to do. The granting of vouchers, relocation vouchers, I mean, correct me if I'm wrong, is there anywhere in the reg where it says the owner must do this? In 24 CFR 886.323, the regulation specifically states that if a family wishes to be rehoused, following the issuance of a notice of default to the owner that they haven't kept the dwelling unit in decent, safe, and sanitary conditions, that HUD shall provide the assistance. Now, that regulation doesn't specify tenant protection vouchers. What the 2018, 2019, and 2020 Appropriations Act provides in a separate section than the specified options that the owner has, that HUD can make with the owner with respect to its enforcement. Section 1010 of the Appropriations Act, it provides specific standards that HUD may consider with respect to issuing relocation assistance to get folks out of these conditions. So the first standard is that the owner has received a notice of default. That has been met. The second is whether the complex still presents imminent health and safety risk to tenants. HUD has not provided any evidence to counteract our evidence that the complex still presents imminent health and safety risk. That's good. So the reg that you're referring to, 886.323E, in your view, that doesn't come into play only when there has been abatement of the contract? No, Your Honor, it does not. The plain language of the regulation itself does not state that abatement is necessary. In addition, HUD was mandated to create guidance for the agency to follow. In HUD notice 2809, that's specified in the plaintiff's amended complaint and in our briefing, where it follows the language of the Appropriations Act, indicating that HUD can issue the vouchers where the owner has received notice of default, and their imminent health and safety risk presented to the residents of that PVRA complex. Senator Marco Rubio, who presented this amendment to Congress, specifically did it for these circumstances so that folks would not have to wait for HUD to, so that there would be funding available for HUD to comply with its own regulation. It may have not been funding in the past. I guess I hear what you're saying. Just going back to the reg that you, I mean, you helpfully cited the reg, it does say shall. Yes, Your Honor. Yes, Your Honor. The sentence right before that says HUD may exercise any of its rights or remedies under the contract or regulatory agreement, if any, including abatement of housing assistance payments, even if the family continues to occupy the unit and rescission of the sale. If, however, the family wishes to be rehoused in another dwelling unit, HUD shall provide assistance in finding such a unit for the family. The family doesn't refer back to the last sentence where there's been abatement? No, Your Honor, it does not. It is a separate section. Again, HUD itself, in its later regulation following the mandate in the Appropriations Act for it to provide guidance to the agency in terms of issuing the vouchers, indicates that abatement is not necessary. Particularly in that HUD notice, HUD distinguishes between replacement vouchers and relocation vouchers. So if the owner never comes into compliance with HUD standards, then the vouchers are replacement housing for folks in the community. If the owner does come into compliance with HUD standards and the housing assistance payment contract continues to be paid by HUD, then those vouchers issued to those families are relocation vouchers and are subject to the sunset provisions, and then they terminate when those families are no longer eligible for voucher assistance. I'll ask the government about the HUD notice. Yes, Your Honor. That's helpful, thanks. Thanks. HUD's final agency action of withholding relocation assistance also violates HUD's statutory mandate to affirmatively further fair housing. HUD's payment for housing at Copper Tree subjects Black tenants to uninhabitable living conditions. This is a part of HUD's pattern for paying for substandard housing for Black tenants in Black neighborhoods, while paying for habitable housing for White tenants in White neighborhoods. HUD has a duty under Section 3608E of the Fair Housing Act to evaluate its denial of relocation assistance to these Black tenants living in uninhabitable conditions, and its effect of that decision on the lack of housing opportunities that are not in unequal conditions. NAACP v. HUD First Circuit case held that HUD's discretionary administration of its grant programs can be reviewed for abuse of discretion under Section 7062 of the APA. However, the district court in this matter applied ADAPT v. HUD. This is a case where HUD is disillusioned with its grantees with respect to them not following grant requirements according to Section 504, and HUD's failure to take enforcement actions against those grantees. This is distinguishable from the facts in our case in that we're not asking HUD to take further actions against the owner. The prerequisites have been met already just by HUD issuing the notice as a default for the plaintiffs to be qualified for relocation assistance. Here, HUD's specific decision to withhold relocation assistance perpetuates its pattern of paying for unequal and substandard housing to Black PBRA tenants in Houston and is reviewable under Section 7062 because these actions are contrary to HUD's mandate to affirmatively further fair housing. HUD's withholding of relocation assistance also violates Section 3604 of the Fair Housing Act and is subject to judicial review. HUD is making decent, safe, and sanitary housing unavailable to plaintiffs because of race. HUD knows that the coppice units are not decent, safe, and sanitary pursuant to its own inspections. The conditions have been met by both the HUD regulation and the Consolidated Appropriations Act to pay for the tenant protection vouchers. No White tenants are subject to these horrific living conditions. So, I assume you're talking about the race discrimination claim now? I'm talking about the fair housing claim that we've also asked for judicial review of under the Act. So, you're talking about the substandard living conditions with respect to a complex that is occupied by majority Black tenants? Yes, Your Honor. As compared to the living conditions in other complexes that are occupied by majority White tenants? Yes, Your Honor. I guess my difficulty with that is I thought we were talking about the issuance of vouchers. Yes, Your Honor. And so, I'm wondering if you're alleging that White tenants are getting vouchers under circumstances where the Black tenants are not being given vouchers? No, Your Honor. That is not the similarly situated characteristic that we're alleging. Okay, I see. The White tenants in the PBRA complexes in the Woodlands do not need tenant protection vouchers because they already have access to decent, safe, and sanitary housing. Our tenants, our plaintiffs, do need the vouchers just to access decent, safe, and sanitary housing. If HUD chose to relocate them to PBRAs that were decent, safe, and sanitary pursuant to HUD rules, then that would be satisfactory under HUD's own regulation. But HUD is not doing that. Why we're asking for specifically the tenant protection vouchers is that there's money afforded to HUD to do that. This $85 million appropriation specific to those vouchers is not a part of HUD's total voucher funding. And the vouchers, I'm sorry, that particular appropriation has meaningful standards for HUD to follow and for the court to order HUD to consider with respect to issuance to the tenants so that they can have access to this funding. You're bringing a disparate treatment claim, not a disparate impact claim? A disparate treatment claim, yes, Your Honor. You're not bringing a disparate impact claim? No, Your Honor, we are not. Thanks. We're also, as stated just now, we're stating that, again, that we've pled plausible facts for a plausible claim of intentional discrimination against HUD based on HUD providing decent, safe, and sanitary housing to white tenants in PBRAs and white areas. And those tenants, again, don't need voucher assistance because they already have access to decent, safe, and sanitary housing. The similarly situated characteristic pled is tenancy in a HUD funded project. Again. You've exceeded your time. Yes, Your Honor. Mr. Sandberg? Good morning. May it please the court. I'm Jeff Sandberg for the United States. Plaintiff's exact theories during this litigation have been a little bit of a moving target and hard to pin down, but they've gestured in various directions and trying to escape unreviewability of their claims and now seem to be very focused on the availability of appropriations in the paragraph to appropriation for relocation vouchers, as opposed to seeking the remedy of abatement of the contract, which would terminate payments to the landlord and require all the tenants to move. I want to get one thing clear right from the outset, which is that HUD is not the owner of these projects. So, Judge Duncan, when you said, you know, what does the owner have to do under regulation 886-323? The owner, this is private subsidized housing, and these tenants have a contract, not with HUD, but with private landlords. So they could, if they wish, sue their landlords for having inadequate conditions. And it's a bit odd that they had actually sued the landlord as part of this case originally, but then chose to drop them. I'm sure I misspoke many times, and I always like to misspeak in my questions so the lawyers can correct me. For things like the constitutional claim where they're saying, look at this housing in the woodlands that's being maintained by private landlords in good condition, and HUD hasn't lifted a finger there. And they're arguing, look at Copper Tree Village. HUD also hasn't lifted a finger there. Well, at least in the precise way we would like, which is to issue relocation vouchers. Instead, HUD has undertaken its normal enforcement remedies. They're not comparing apples and apples there. One of my concerns was, well, it seems that the final agency action and the committed to agency discretion are sort of related or overlapping ideas here. So let me ask you, one concern that I had was, well, where is the requirement that the vouchers be given? I was referred to a reg, which I had read already, 886.323, and it does say shall. If, however, the family wishes to be rehoused in another dwelling, HUD shall provide assistance. So what's your response to that? Why doesn't that create the sort of confinement of discretion? There are a number of both textual and contextual reasons why it doesn't. Starting with the text, that sentence begins with if, however, the family, however, is a reference back to the logical idea contained in the previous sentence. The family is the same family that was just mentioned. And it's not broken out in a separate subsection of 886.323. This is a continuation of a single logical thought, and there's a period in the middle of it rather than a comma to make it more readable. The contextual, which is pretty conclusive, factors are at the time this regulation was promulgated in 1979, the only way HUD would ever have money to relocate families would be if they abated the contract. There was no authority. That didn't come into being until Senator Rubio's amendment in 2016 to use funds to relocate a family unless abatement had happened. And if you look at the preamble to the 1979 rule, 44 Federal Register 7363, there's a section talking about effects on the eligible family if the contract is terminated. And it says HUD will provide assistance in finding eligible families, suitable units and other buildings in the event assistance payments are abated. Abated means stop paying the landlord. Those tenants then lose their ability to live in the housing with subsidized housing and everybody there has to move away. It then says it is the department's intention to work with owners, tenants and other interested parties to the extent possible to forestall such action, meaning HUD's longstanding policy has been to try to keep paying on the building if it thinks it can work with tenants and the owner to do so. And I would note that if you abate the contract, it's sort of a one size fits all solution. All of those tenants there, whether they want to move or not, and there are 263 units at issue here. It's not just a handful of plaintiffs who brought this lawsuit that HUD has to think about. If HUD abates the whole contract, basically everyone there has to move. So it's true if it's true, as plaintiffs have pointed out, that HUD has an additional tool in its toolkit, which is it has the option to both continue to pay the landlord for the units and to offer relocation vouchers to plaintiffs if it sees fit to do so. But there's nothing in the statute that requires HUD to exercise that option. And the HUD Notice 2018-09 that Plaintiffs' Council has referred to on page seven, there's a single paragraph that notes that HUD has that authority. HUD knows it has its authority. But it just says the 2018 Act provides that HUD may provide tenant protection vouchers for families in the conditions specified in the Appropriations Act. Congress didn't say, HUD, in considering whether to avail itself of this proviso, you must consider economic impact on this or geographic impact, different areas of the country, the length of the duration of the violation or anything. I mean, if Congress had said, here's what you need to weigh, HUD, then courts themselves would have standards to apply in deciding, OK, did HUD act reasonably in choosing to give money to these plaintiffs and not to other people? Remember, this is a finite pot of funds. So HUD spends the money on vouchers for these plaintiffs. It's not spending those funds on other persons who are at risk of losing assistance altogether. So there's simply no way. Plaintiffs may have a reasonable policy argument to make that they should have been issued vouchers here. As it happens, HUD decided to work with the owner to remedy conditions and the complex subsequently passed HUD inspection on multiple occasions. But it's for plaintiffs to persuade HUD as a policy matter through the comment process that this is something that requires using that extraordinary tool in the toolkit and to seek remedies against the landlord if conditions aren't improving. Remember, this is a private complex. They can sue their landlord for unlivable conditions. So this isn't the kind of lawsuit that can be brought in court. In your view, is the argument that this decision is committed to agency's discretion under the APA, is that alternative to there's no final agency action here? In other words, are those two alternative bases or are there certain claims for which one argument applies to the other argument? They are alternative and here's why. If HUD had issued a letter here saying we are in receipt of a request for relocation vouchers from you plaintiffs. We have given the matter consideration. We are denying your request because we do not think there's an imminent risk to health and safety. Or we don't think that this is a sufficient use of agency priorities or whatever. That would then be final agency action and we could have a fight about committed agency discretion depending on the reasons that the agency gave. But at least there would be something that you'd be pointing at, right? The agency has purported to deny someone's rights. But the agency didn't issue such a letter and it didn't have to issue such a letter. And the final agency action part of this case is really just the flip side of their failure to bring their claim under the right part of the APA, which is Section 706.1. Section 706.1 says that you can bring suit to delay, sorry, to compel agency action that has been unlawfully withheld or unreasonably delayed. So if you think, for example, HUD should either is required to issue you a benefit or is required to consider whether to issue you a benefit, you bring suit under 706.1 to say, here's the statute or reg that says you're required to consider giving me this benefit or indeed you're required to give me this benefit. They can't point to any statute or regulation like that. And they disclaimed in district court, I suppose appropriately, that they weren't trying to bring a 706.1 claim. But you can't bring, that's the only kind of claim you can bring when the agency hasn't acted. You can't reframe it as a 706.2 claim and say that the final agency action is that the agency has failed to act. Thank you. Sorry, I guess I would just add on the constitutional claim, unless there are questions about the other parts of the case. That again, the plaintiffs have made very clear that the action that they're challenging is the failure to provide them with relocation vouchers. And so you have in undertaking the 12 v 6 inquiry that this court laid out and among other cases, the Lincoln property case recently to figure out whether you have a plausible claim of race discrimination, you really have to have some inferences drawn from something that HUD was acting on the basis of race and HUD's own actions. And to point to the fact that private landlords are maintaining unspecified complexes in, although they're allegedly white majority, in good condition in the woodlands just isn't a basis for inferring that the decision not to provide relocation vouchers at Calvertree Village was discriminatory. I mean, like they're in communities 30 miles apart. They're associated with different public housing agencies. There's all manner of reasons to just sort of at the outset question why one should conclude that there's a plausible allegation of discrimination. And it really is. It's not enough for the plaintiffs to come forward with facts that they can spin in a way that is consistent with liability. They have to actually nudge their claims beyond the conceivable to the plausible. If there are no further questions beyond that, we rest on the brief and we ask that the judgment be affirmed. Okay. Thank you. Five minutes. Thank you, Your Honor. I'd like to address a couple matters that my colleague Mr Sandberg mentioned in his in his presentation. With respect to the abatement language in the regulation 86.323, we stand by the number one plain language of the statute, which does not require abatement of the contract. And again, HUD's own regulation, I'm sorry, HUD's own notice that was enacted in 2018 following the Appropriations Act makes it clear that abatement is not necessary in terms of HUD issuing the tenant protection voucher assistance. So the mandatory language of the HUD regulation, we stand by the plain language of the statute. And in HUD's brief, they cited a federal register notice. But in that notice, the concern was that whether there would be funds for these tenants who have been displaced because of an owner not complying with HUD regulations. And so the notice was indicating that there would be funds to rehouse those tenants if they were subject to abatement. 40 years later in this, now that we have the Appropriations Act, which provides funds who are subject to these conditions, there's funding now to rehouse these tenants in accordance with HUD's 886.323 regulation. With respect to the discretionary portion of the May, as indicated in the Appropriations Act, we're again, as explained in our brief, relying on more than just a basic presumption of judicial review. And that was most recently explored again by the Supreme Court and Weyerhaeuser v. U.S. Wildlife. And what we're saying is that our case is similar to Weyerhaeuser and that HUD did not consider the relevant factors of the statute as set forth in the Consolidated Appropriations Act with respect to its discretionary decision to issue tenant protection vouchers to the plaintiffs. In addition, we're also, if you look at Norton, the 2004 Supreme Court case, Justice Scalia noted in that case that when an agency is not complying with a land use plan, under that type of noncompliance by the agency, or an agency action not in compliance with an agency's land use plan, is, again, an agency not acting in accordance with its own plan, is reviewable under Section 706.2. So we're stating that HUD has enacted in accordance with its regulation. And in addition, we're saying that it's an abuse of discretion for HUD not to have considered the factors as set forth in the Appropriations Act in terms of its decision to not issue the funding. With respect to the final agency action argument made by my colleague, we stand by the fact that there is final agency action in this case. Final agency action requires two elements. One, that there's been a consummation of the agency's decision-making process. And two, that there are legal consequences or rights have been determined. That's per Bennett v. Speer. The first element has been met in that HUD issued a Notice of Default to the owner. The owner did not comply within the time period specified in the Notice of Default. HUD considered that the owner didn't comply. And then they also still were obviously well aware of the hazardous conditions present at the complex. Ms. Miles, sorry to interrupt. Mr. Sandberg represented to us that since, I guess subsequently to this, the complex has passed HUD review? That is not in the record, Your Honor. That's not in the appellate record. Okay, thanks. Yes, Your Honor. And again, number two, in terms of the legal consequences to the tenants, the tenants are still having to endure imminent health and safety risks at the complex, which has not been countered by HUD in terms of the record. There's been the plaintiff's declarations have indicated that there's extreme security issues, extensive mold that's simply been painted over, inevitable appliances, inevitable smoke detectors, damaged roofs, lead paint, electrical hazards, plumbing issues. All those issues are our plaintiffs are having to endure while being living at that complex. Thank you, Your Honor. Thank you. Case will be submitted. And we will call the next case for the day.